Slip Op. 16-64

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| RZBC GROUP SHAREHOLDING CO., LTD., RZBC CO., LTD., RZBC IMP. & EXP. CO., LTD., and RZBC (JUXIAN) CO., LTD., | |
| Plaintiffs, | |
| v. | Before: Richard W. Goldberg, Senior Judge Court No. 15-00022 |
| UNITED STATES, | **PUBLIC VERSION** |
| Defendant, | |
| and | |
| ARCHER DANIELS MIDLAND COMPANY, CARGILL, INCORPORATED, and TATE & LYLE INGREDIENTS AMERICAS LLC, | |
| Defendant-Intervenors. | |

**OPINION AND ORDER**

[Remanding in part the Final Results of a review of a countervailing duty order on citric acid from the People's Republic of China.]

Dated: June 30, 2016

*Michael S. Holton*, Husch Blackwell LLP, of Washington, DC, argued for plaintiffs. With him on the brief was *Jeffrey S. Neeley*.

*Patricia M. McCarthy*, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant.  With her on the brief were *Melissa M. Devine*, Trial Attorney, *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, and *Jeanne E. Davidson*, Director.  Of counsel on the brief was *Whitney M.*

*Rolig*, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

*Patrick J. Togni*, King & Spalding LLP, of Washington, DC, argued for defendant-intervenors.  With him on the brief was *Joseph W. Dorn*.

Goldberg, Senior Judge:  This case concerns the fourth administrative review of a countervailing duty order on citric acid and certain citrate salts from the People's Republic of China (the "PRC").  *See Citric Acid and Certain Citrate Salts from the People's Republic of China*, 79 Fed. Reg. 78,799 (Dep't Commerce Dec. 31, 2014) (final admin. review) ("*Final Results*") (covering imports from January 1, 2012 to December 31, 2012).  Plaintiffs, the RZBC Group Shareholding Co. and related companies ("RZBC"), sue to reduce the final countervailing duty rate imposed on them by the U.S. Department of Commerce ("Commerce" or "the agency").  Constituents of the U.S. domestic industry—including Archer Daniels Midland Company, Cargill, Incorporated, and Tate & Lyle Ingredients Americas ("ADM")—side with the agency in defending the countervailing duty rate against these attacks.

After carefully considering the parties' briefs and the record, the court remands one issue to commerce for reconsideration: the adverse inference that RZBC benefited from the Buyer's Credit program.

## GENERAL BACKGROUND

Countervailing duties serve the same purpose as their better-known cousins, antidumping duties:  They level the playing field between U.S. manufacturers and their overseas competition.  But each regime addresses a different problem.  Antidumping duties were made to fight price discrimination, so if a foreign producer sells goods in the United States for less than in the home market, antidumping duties bring the U.S price back to fair value.  *See* 19 U.S.C. § 1673 (2012).  Countervailing duties ("CVDs"), by contrast, were created to correct the cost-distorting effect of

subsidies.  When a foreign government lends support to a producer, CVDs boost the producer's

U.S. prices to offset the net benefit from the subsidy.  *See id.* § 1671(a).

In the review underlying this appeal, Commerce imposed a 17.55% total CVD rate on

RZBC's citric acid exports.  *Final Results*, 79 Fed. Reg. at 78,800.  With this duty, Commerce

aimed to offset the benefit RZBC received from concessional loans, steam coal, sulfuric acid,

limestone flux, land purchases, and other subsidies from the PRC.  *See* I&D Mem. 14–32, PD

226 (Dec. 22, 2014).  On appeal, RZBC contests aspects of Commerce's work, including (1) the

agency's decision to adversely infer that RZBC benefited from a concessional lending program

called the Buyer's Credit program; (2) the decision to impose an adverse 10.54% rate with

respect to the Buyer's Credit program; (3) the agency's selection of benchmark sources for steam

coal, sulfuric acid, and limestone flux; (4) the agency's selection of benchmark sources for a

land-purchase subsidy benchmark; and (5) the decision not to omit "special equipment services"

surcharges from certain price quotes used to calculate the international freight-rate component of

the limestone flux benchmark.

The court has jurisdiction to hear these claims under 28 U.S.C. § 1581(c).  The court

must uphold the agency's results unless they are "unsupported by substantial evidence on the

record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

In light of this standard, the court remands for reconsideration Commerce's adverse

inference that RZBC benefited from the Buyer's Credit program.  Given the remand on the

adverse-inference issue, the court has no cause to consider the validity of the ultimate 10.54%

adverse-interest rate.  With respect to the remaining issues, the court sustains the *Final Results* in

full.

I.    **Commerce's Adverse Inference that RZBC Benefited from the Buyer's Credit Program Lacks the Support of Substantial Evidence**

In the underlying review, Commerce adversely inferred that RZBC benefited from the Buyer's Credit program, a concessional-loan program instituted by the Government of China ("GOC") owned EXIM Bank.  I&D Mem. 75.  The GOC and RZBC had represented that RZBC received no benefit from the program, but the GOC refused to allow Commerce to verify this representation by querying the EXIM Bank's internal database of financing information.  *Id.* at 74.  Accordingly, Commerce found that RZBC benefited from concessional loans offered under the Buyer's Credit program and ascribed an adverse interest rate of 10.54%.  *Id.* at 74–76.  RZBC argues that the GOC cooperated sufficiently at verification to preclude an application of "adverse facts available" ("AFA") premised on the GOC's failure to cooperate.  RZBC further argues that, even if the GOC's cooperation was insufficient, Commerce unduly rejected the prospect of verifying non-use with RZBC, notwithstanding "neutral evidence on the record" indicating that RZBC did not use the Buyer's Credit program.  Mem. of Law in Support of Pls.' Mot. for J. on the Agency R. Under USCIT Rule 56.2, at 22, ECF No. 29.  Therefore, says RZBC, Commerce lacked grounds to adversely infer that RZBC drew benefit from the Buyer's Credit program.  The court holds that Commerce's adverse inference lacks the support of substantial evidence.

**A.  Background**

Commerce's application of AFA, or adverse inferences, is governed by the two-step analysis set forth in 19 U.S.C. § 1677e.  First, Commerce is obligated to resort to "facts otherwise available" if the agency finds that "necessary information is not available on the record" or that an interested party or other person has withheld requested information, significantly impeded Commerce's proceeding, or provided information that Commerce must,

but cannot, verify under 19 U.S.C. § 1677m(i).  19 U.S.C. § 1677e(a).  Second, Commerce has

discretion to draw an "inference that is adverse to the inferences of [a] party in selecting from

among the facts otherwise available" if the agency "finds that [the] interested party has failed to

cooperate by not acting to the best of its ability to comply with a request for information."  *Id.*

"Applying AFA" is shorthand for when Commerce makes affirmative findings under both steps

of 19 U.S.C. § 1677e and as a result draws an adverse inference.

        In CVD proceedings, Commerce will sometimes draw an adverse inference due to a

foreign government's lack of cooperation in providing requested information, as opposed to a

respondent's.  *See Archer Daniels Midland Co. v. United* States (*ADM I*), 37 CIT __, __, 917 F.

Supp. 2d 1331, 1342 (2013); *GPX Int'l Tire Corp. v. United States*, 37 CIT __, __, 893 F. Supp.

2d 1296, 1333 (2013); *Fine Furniture (Shanghai) Ltd. v. United* States, 36 CIT __, __, 865 F.

Supp. 2d 1254, 1262 (2012).  Such an inference might nonetheless collaterally effect a

respondent, even though the respondent did nothing to incur the inference.  *ADM I*, 37 CIT at __,

917 F. Supp. 2d at 1342; *GPX*, 37 CIT at __, 893 F. Supp. 2d at 1333; *Fine Furniture*, 36 CIT at

__, 865 F. Supp. 2d at 1262.  Although these collateral effects can be excusable, Commerce must

strive to avoid them by examining the record.  *ADM I*, 37 CIT at __, 917 F. Supp. 2d at 1342;

*GPX*, 37 CIT at __, 893 F. Supp. 2d at 1333; *Fine Furniture*, 36 CIT at __, 865 F. Supp. 2d at

1262.  "When Commerce has access to information on the record to fill in the gaps created by

the lack of cooperation by the government, as opposed to [a respondent] . . . it is expected to

consider such evidence."  *GPX*, 37 CIT at __, 893 F. Supp. 2d at 1333.

        In the review at issue here, Commerce drew its adverse inference that RZBC benefitted

from the Buyer's Credit program based on the GOC's failure to cooperate during a verification

meeting.  In a questionnaire response leading up to the verification meeting, the GOC had stated

that it maintained a database of loans provided through the Buyer's Credit program, and that the database included the names of participating Chinese firms as well as their buyers.  The GOC also stated that, to the best of its knowledge, none of RZBC's customers used the Buyer's Credit program.  Commerce notified the GOC in the verification outline that the agency would seek on-site access to the EXIM Bank's database to confirm that none of RZBC's buyers were listed as beneficiaries of the Buyer's Credit program.  I&D Mem. 74.  At verification, representatives of the GOC orally reiterated that the EXIM Bank "maintains records of all lending provided under the program."  *Id.*  GOC representatives further stated that "they searched [the EXIM Bank] records and found no entry for any of the customers' names given to them by [RZBC]."  *Id.*  But the GOC refused Commerce the requested database access on grounds that "proper authorization" was required.  GOC Verification Report 3, PD 207 (Oct. 8, 2014).

In lieu of database access, the GOC offered "screen shots of EXIM's query results," which Commerce's officials "declined to review."  *Id.*  Commerce reasoned that without real-time database access, Commerce could not sufficiently "test and confirm" RZBC and the GOC's purported non-use, per the agency's "standard verification protocols."  I&D Mem. 74.  In Commerce's view, by refusing database access, the GOC "prevent[ed] the verifiers from completing their verification procedures" and "precluded the [agency] from verifying the non-use claims made by [RZBC] and the GOC."  *Id.*

The GOC and RZBC rebutted that Commerce could verify non-use "at the company level" (that is, with RZBC, instead of with the GOC).  *Id.* at 73–74.  In prior proceedings, Commerce had determined that the GOC's EXIM Bank was the "primary entity" with which the agency could verify non-use of the Buyer's Credit program.  *Id.*  Commerce had reasoned that, based on the record available in those prior proceedings, the EXIM Bank appeared to disburse

loans to "the customers of Chinese producers"—i.e. to buyers, not to the Chinese producers themselves. *Id.* But the GOC insisted that the EXIM Bank disbursed Buyer's Credit funds "directly to the Chinese producers," rendering verification with RZBC feasible. *Id.*

To test the GOC's claim, Commerce asked the GOC "whether the transfer of funds directly to the Chinese producer was explicit in the *Administrative Measures*" that governed the Buyer's Credit program. *Id.* The EXIM Bank officials explained "that [the disbursement] was not explicit in law, but understood in practice." *Id.* a 74. So Commerce followed up by asking the GOC for "sample contracts and documentation" to illustrate the usual disbursement song and dance. *Id.* To allay confidentiality concerns, Commerce "provided . . . the option of redacting all business proprietary information." *Id.* But the GOC nonetheless "refused to provide the requested information." *Id.* In sum, although "[t]he GOC provided an oral explanation of how [RZBC] might be involved in the application process and the disbursement of funds," the GOC never tendered the disbursement evidence of the sort that could be "tied to the EXIM Bank's audited financial statements." *Id.* at 75. As a result, "[h]ad [Commerce] attempted to verify non-use at [RZBC's] facility with only declarative statements as guidance, [the agency] could have done no more than speculate on how to confirm non-use; any procedures [Commerce] might have undertaken . . . would have been guess work . . . concerning the operations of the program." *Id.* at 74–75. Commerce therefore declined the GOC's invitation to verify non-use of the Buyer's Credit program with RZBC, and "continue[d] to find [that the agency's] ability to determine non-use . . . hinges on its ability to examine usage records in the possession of the GOC." *Id.* at 74.

Commerce also found that the GOC's refusal to provide the information that the agency had requested compelled the use of facts otherwise available. *Id.* at 75. And Commerce further

determined that the agency should draw an adverse inference regarding use of the Buyer's Credit

program because "the GOC failed to cooperate by not acting to the best of its ability." *Id.*

Accordingly, Commerce inferred that RZBC had benefited from the Buyer's Credit program and

applied an AFA interest rate of 10.54%. *Id.* at 76.

### B. Discussion

The court holds that Commerce's adverse inference lacks the support of substantial

evidence. Commerce was justified in concluding that the GOC did not act "to the best of its

ability" during verification because the GOC refused Commerce's requests for access to the

EXIM Bank's database as well as "sample contracts and documentation." *Id.* at 74–75; GOC

Verification Report 3. Likewise, Commerce had grounds to conclude that most of the "neutral

evidence on the record" invoked by RZBC did not amount to verifiable record evidence that

RZBC abstained from using the Buyer's Credit program. Pls.' Mot. for J. on the Agency R. 22.

But there is one piece of record evidence that appears as though it should have been verifiable.

Specifically, the record indicates that the Buyer's Credit program is available only with respect

to sales contracts valued over $2 million dollars, and RZBC swore under penalty of perjury that

it had no such contracts. I&D Mem. 73; GOC NSA Resp. Ex. C-1, at art. 5, PD 78 (Mar. 19,

2014). Commerce never explained why it could not verify RZBC's non-use of the Buyer's

Credit program by checking the firm's audited financial statements or other books and records

for the value of RZBC's sales contracts. *See* I&D Mem. 73–75. Given that Commerce's adverse

inference collaterally impacted RZBC (who bore the brunt of the 10.54% adverse interest rate),

the agency had an obligation to heed any verifiable evidence that RZBC never used the Buyer's

Credit program. *ADM I*, 37 CIT at __, 917 F. Supp. 2d at 1342; *GPX*, 37 CIT at __, 893 F. Supp.

2d at 1333; *Fine Furniture*, 36 CIT at __, 865 F. Supp. 2d at 1262.  As a result, Commerce's

adverse inference that RZBC used the Buyer's Credit program is unwarranted.

First, the court addresses what the agency got right.  Commerce had grounds to find that

the GOC did not act "to the best of its ability" while Commerce was trying to verify non-use of

the Buyer's Credit program.  I&D Mem. 75.  "Compliance with the 'best of its ability' standard

is determined by assessing whether [the] respondent has put forth its maximum effort to provide

Commerce with full and complete answers to all inquiries in an investigation. While the standard

does not require perfection and recognizes that mistakes sometimes occur, it does not condone

inattentiveness, carelessness, or inadequate record keeping."  *Nippon Steel Corp. v. United*

*States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003).  At the verification meeting, the GOC refused to

allow Commerce access to the EXIM Bank's database even though Commerce had notified the

GOC in the Verification Outline that the agency would seek such access.  I&D Mem. 74.  The

GOC stated that the "proper authorization" had not been secured.  GOC Verification Report 3.  If

the GOC were acting to the best of its ability, it would have at the very least sought the necessary

authorization in advance.  The GOC's failure to do so smacks of "inattentiveness," a hallmark of

less-than-best effort.  *Nippon*, 337 F.3d at 1382.

RZBC rebuts that the GOC offered "screen shots" in lieu of database access.  Pls.' Mot.

for J. on the Agency R. 22.  But screenshots are not what Commerce asked for, nor are they a

suitable substitute.  Screenshot is just a fancy way to say picture, and a picture is something that

can be fabricated in anticipation of a meeting like the verification meeting.  Access to a database,

by contrast, is interactive, hence tougher to spoof.  Because, with database access, Commerce

would be able to request its own queries in real time, mucking with the results would be much

more difficult than with a picture.  So screenshots are incommensurate with database access, and

therefore irrelevant in determining whether the GOC acted to the best of its ability.  The fact

remains that the GOC failed to act to the best of its ability when it refused Commerce database

access.

Besides, the GOC also acted to less than the best of its ability in declining Commerce's

requests for "sample contracts and documentation" that would illustrate the Buyer's Credit

disbursement process.  GOC Verification Report 3.  Commerce sought the documents so the

agency could see whether verification with RZBC (as opposed to the GOC) would be feasible,

but the GOC refused on confidentiality grounds.  *Id.*  (In briefing, RZBC also raises

confidentiality as a concern with respect to the EXIM Bank's database, even though it is not

clear that this concern was vocalized at verification.  *See* Pls.' Mot. for J. on the Agency R. 21–

22.)  But Commerce was sensitive to the GOC's confidentiality concerns, offering "the option of

redacting all business proprietary information" from the tendered samples.  GOC Verification

Report 3.  The GOC simply refused to do so without so much as proposing alternatives that

might be still more confidentiality-conscientious than Commerce's offer.  This cursory response

strikes the court as falling somewhere short of the "maximum effort" required by the best-of-its-

ability standard.  *Nippon*, 337 F.3d at 1382.  Commerce was therefore justified in concluding that

the GOC had not behaved to the best of its ability, both in refusing to provide sample contracts

and documentation and in denying access to the EXIM Bank's database.

Commerce also weathers all but one of RZBC's arguments that the agency "failed to

consider neutral evidence on the record [showing] non-use [of the Buyer's Credit program] by

RZBC."  Pls.' Mot. for J. on the Agency R. 22.  RZBC begins by invoking the now-familiar rule

that Commerce must "seek to avoid an adverse impact [on a respondent] if relevant information

exists elsewhere on the record."  *Id.*  RZBC further argues that "th[is] court has held that the

existence of and the amount of the benefit conferred [by a subsidy program] should be based on

the respondent parties' information." *Id.* RZBC notes that Commerce verified non-use of a

whopping eighty-two other programs, including the EXIM Seller's Credit Program, with RZBC.

*Id.* at 23. When verifying non-use of those other programs, not once did Commerce find that

RZBC "reported inaccurately or failed to report a program." *Id.* Yet Commerce still declined to

verify non-use of the Buyer's Credit program with RZBC. And, according to RZBC, neutral,

verifiable record evidence suggests that RZBC eschewed the Buyer's Credit program. *Id.*

Specifically, the record establishes that (1) RZBC, not its buyers, would have been the recipient

of any Buyer's Credit loan disbursements, (2) RZBC would have been required to initiate and

cooperate in the Buyer's Credit application process, and (3) eligible sales contracts would have

to be valued above $2 million. *Id.* at 26, 28. Notwithstanding these requirements, RZBC

disavowed ever participating in the Buyer's Credit application process or having any sales

contracts valued above $2 million. I&D Mem. 73. The upshot, says RZBC, is that Commerce

could have verified RZBC's claims of non-use by crosschecking RZBC's audited financial

statements for disbursements, application participation, or hefty sales contracts. Pls.' Mot. for J.

on the Agency R. 28.

For the most part the court disagrees, beginning with RZBC's contention that the court

has imposed on Commerce an obligation to base "the existence of and amount of the benefit

conferred [by a subsidy program] . . . on the respondent parties' information." *Id.* at 22. No we

have not. The court has, at times, observed that foreign governments are typically in the best

position to provide information on how a subsidy program is administered, whereas respondents

are best situated to provide information on the particulars of the benefit conferred to them, if any.

*See, e.g.*, *Archer Daniels Midland Co. v. United* States (*ADM I*), 37 CIT __, __, 917 F. Supp. 2d

1331, 1342 (2013) (citing *Essar Steel Ltd. v. United States* (*Essar Steel CIT*), 34 CIT 1057, 1070,

721 F. Supp 2d 1285, 1297 (2010), *rev'd in part on other grounds*, 678 F.3d 1268 (Fed. Cir.

2012)).  But there remain instances in which this shorthand truism will not hold.  Sometimes, for

instance, respondents simply will not have furnished Commerce with the information the agency

needs to formulate benefit benchmarks.  *E.g.*, *Fine Furniture (Shanghai) Ltd. v. United* States, 36

CIT __, __, 865 F. Supp. 2d 1254, 1262 (2012).  Or perhaps, even if respondents claim to have

provided the necessary benefit information, Commerce will be obligated to verify the

information under 19 U.S.C. § 1677m(i), and the respondents' information will not be amenable

to such rigorous examination.  There is no *per se* rule that Commerce must, in every proceeding,

base the amount of the benefit conferred on the respondent parties' data, whatever that data may

be.  Rather, as already articulated, Commerce's obligation when drawing an adverse inference

based on a lack of cooperation by a foreign government is to avoid collaterally impacting

respondents to the extent practicable by examining the record for replacement information.

*ADM I*, 37 CIT at __, 917 F. Supp. 2d at 1342; *GPX*, 37 CIT at __, 893 F. Supp. 2d at 1333; *Fine

Furniture*, 36 CIT at __, 865 F. Supp. 2d at 1262.  This rule holds whether Commerce is drawing

the adverse inference as to the administration of a subsidy program, *ADM* I, 37 CIT at __, 917 F.

Supp. 2d at 1342, or as to the benefit to a particular respondent, *Fine Furniture*, 36 CIT at __,

865 F. Supp. 2d at 1262.

Most of the neutral record evidence invoked by RZBC does not cure the GOC's lack of

cooperation because the information is unverifiable.  RZBC argues that the GOC disbursed

Buyer's Credit funds directly to Chinese producers, such that Commerce could verify RZBC's

stated non-use by checking the firm's audited financial statements for traces of any such

disbursements.  Pls.' Mot. for J. on the Agency R. 24–26.  But Commerce properly inferred that

the Buyer's Credit program disbursed to Chinese producers' buyers, not to the producers

themselves.  In previous reviews, Commerce determined that Buyer's Credit funds were

disbursed to buyers.  I&D Mem. 73.  The GOC challenged this understanding in the instant

review, and Commerce asked the GOC for tangible proof in the form of sample contracts and

documentation.  I&D Mem. 73–74.  The GOC provided none.  *Id.*  So Commerce reendorsed its

disbursement-to-buyers determination.  *Id.*

        RZBC now points to two reports that ADM put on the administrative record, Pls.' Mot.

for J. on the Agency R. 24–26, both of which detail the general application and disbursement

process for EXIM Bank's concessional-loan programs (including the Buyer's Credit program),

NSA Submission Exs. 18 & 19, PD 49 (Nov. 12, 2013).  The reports suggest that Chinese

producers, not their buyers, receive loan disbursements.  NSA Submission Ex. 18 at 4, Ex. 19 at

19.  But the reports do not contradict Commerce's determination, because they discuss the EXIM

Bank's concessional lending programs generally, and provide no specific information on the

operation of the Buyer's Credit program.  The reports therefore cannot have compelled

Commerce to conclude that Chinese producers like RZBC received Buyer's Credit

disbursements.  Because Commerce's disbursement-to-buyers determination stands, nothing

about the disbursement process lights a path to verification with RZBC.

        Nor could Commerce verify non-use with RZBC on grounds that RZBC would have been

involved in the Buyer's Credit application process, but said it was not.  Here, RZBC offers

Article 14 of the *Administrative* measures, which lists Chinese producers' "credit materials and

related supporting documents" as required documentation.  Pls.' Mot. for J. on the Agency R. 26

(citing GOC NSA Resp. Ex. C-1).  RZBC also again invokes the two reports submitted by ADM.

*Id.* at 25.  According to RZBC, if the EXIM Bank would demand credit materials and other

documents pertaining to Chinese producers, then the producers would necessarily be involved in any application process and would therefore know if their buyers used the program.  In light of the evidence submitted by RZBC, the firm did have a reasonable basis to swear that it knew that none of its buyers used the Buyer's Credit program because RZBC never saw any applications. But the problem is that verifying RZBC's claim is nigh on impossible.  The court cannot see a way for Commerce to reliably tie RZBC's potential involvement in an application process to RZBC's audited financial statements, or any other books and records.  This being the case, "any [verification] procedures [Commerce] might have undertaken at [RZBC] simply would have been guess work based on assumptions concerning the operations of the program."  I&D Mem. 74–75.  So the court cannot hold that Commerce could have verified non-use with RZBC simply because RZBC would know whether RZBC was or was not involved in the application process.

But Commerce never explained why it could not verify non-use of the Buyer's Credit program by taking a peek at RZBC's sales contracts.  Article 5 of the *Administrative Measures* suggests that the Buyer's Credit program is unavailable with respect to sales contracts under $2 million dollars.  GOC NSA Response Ex. C-1, at art. 5.  As far as the court is aware, no other evidence on the record contradicts Article 5's $2 million dollar requirement during the period of review.  And when Commerce asked whether RZBC had "signed any single sales contract exceeding two million U.S. dollars for a sale that included, in whole or in part, subject merchandise to the United States," the company said no.  I&D Mem. 73; RZBC NSA Resp. 9, PD 76 (Mar. 19, 2014).  Based on this answer and the text of Article 5, verifying RZBC's non-use of the Buyer's Credit program seems like it should have been a straightforward process: Commerce could simply have checked RZBC's audited financial statements or other books and records for sales-contracts values (or perused whatever other documentation would satisfy

Commerce; one expects the value of RZBC's sales contracts, unlike whether or not the company

helped with loan applications, to be internally documented).  Commerce never provided any

explanation of why reviewing the sales contracts would not allow the agency to sufficiently

verify non-use of the Buyer's Credit program.  I&D Mem. 73–75.

    We repeat once more, Commerce has an obligation to avoid collaterally impacting a

respondent with an adverse inference drawn as a consequence of a foreign government's

noncooperation by consulting the record.  *ADM I*, 37 CIT at __, 917 F. Supp. 2d at 1342; *GPX*,

37 CIT at __, 893 F. Supp. 2d at 1333; *Fine Furniture*, 36 CIT at __, 865 F. Supp. 2d at 1262.  In

this case, the record appears to present easily verifiable evidence that RZBC did not use the

Buyer's Credit program because it never signed a sales contract above $2 million.  Commerce

never addressed this evidence.  Therefore, on remand, Commerce must reconsider whether it can

verify RZBC's non-use of the Buyer's Credit program by inspecting RZBC's audited financial

statements or other books and records for sales contracts valued over $2 million.  If the agency

continues to conclude that verifying non-use with RZBC is impossible, then it must explain how

this can be the case in light of the $2 million threshold laid out in the *Administrative Measures*.

If, on the other hand, Commerce concludes that RZBC is in a position to verify non-use, then the

agency must either make an attempt at doing so or explain why not.[1]

---

[1] RZBC also attacks Commerce's conclusion that verification at RZBC "would have been guess work based on assumptions concerning the operations of the program" on grounds that, if Commerce had to guess about how the Buyer's Credit program worked, then the agency had no grounds to initiate its investigation of the program under 19 U.S.C. § 1671a(b)(1).  This argument fails because the standard for investigating a program is low, *RZBC Grp. Shareholding Co. v. United States*, 39 CIT __, __, 100 F. Supp. 3d 1288, 1295 (2015), and distinct from the requirement that Commerce verify certain information, *see* 19 U.S.C. §§ 1677e(a)(2)(D), 1677m(i).
    Also, because the court holds that RZBC's adverse inference lacks the support of substantial evidence, the court does not reach the issue of whether Commerce's 10.54% adverse interest rate is proper.

## II.     Commerce Properly Selected Benchmark Sources for Steam Coal, Sulfuric Acid, and Limestone Flux

Among the inputs RZBC used to produce its citric acid were steam coal, sulfuric acid, and limestone flux.  Commerce calculated benchmarks for each of these inputs by selecting price data from a variety of sources proposed by RZBC and ADM.  *See* Preliminary Decision Mem. 17–19, 22, PD 146 (June 19, 2014); I&D Mem. 87–92.  RZBC now takes issue with Commerce's selections.  RZBC argues that Commerce was obligated to calculate benchmarks using only a select set of prices that RZBC deemed "specific to RZBC's inputs" in terms of grade, specification, and quantity.  Pls.' Mot. for J. on the Agency R. 41, 44–45.  The court disagrees, and sustains Commerce's selection of price data.

### A.  Background

Before turning to the merits, the court must first further explain Commerce's benchmark calculation process.  Commerce's benchmark calculations are governed by both statute and regulation.  Under 19 U.S.C. § 1677(5)(E)(iv), Commerce must set benchmarks that reflect "prevailing market conditions."  The statute further defines prevailing market conditions as including "price, quality, availability, marketability, transportation, and other conditions of purchase or sale."

19 C.F.R. § 351.511(a)(2) (2016) provides additional guidance on how Commerce sets benchmarks.  The regulation offers three methodological tiers in descending order of availability. Under tier one, Commerce sets benchmarks using a "market-determined price . . . resulting from actual transactions in the country in question. . . .  In choosing [actual transactions, Commerce] consider[s] product similarity; quantities sold, imported, or auctioned; and other factors affecting comparability."  But sometimes market-determined prices are unavailable, in which case Commerce drops to the second tier and uses a "world market price."  For Commerce to use a

world market price, "it [must be] reasonable to conclude that such price would be available to

purchasers in the country in question.  [Furthermore, w]here there is more than one commercially

available world market price, [Commerce] will average such prices to the extent practicable,

making due allowance for factors affecting comparability."  If, however, "there is no [tier-two]

world market price available to purchasers in the country in question," then Commerce repairs to

the third tier and calculates a benchmark "consistent with market principles."

          In the Preliminary Results, Commerce adversely inferred that actual Chinese market

prices for steam coal, sulfuric acid, and limestone flux were "significantly distorted by the

involvement of the GOC."  Preliminary Decision Mem. 5.  As a result, tier one was not available,

and Commerce took the middle road, tier two, to calculate benchmarks.  *Id.*  at 5, 16, 18, 21.  To

do so, Commerce needed at least one "world market price" for each of the three inputs.  19

C.F.R. § 351.511(a)(2)(ii).

          ADM proposed that Commerce get some of its world market prices from the Global

Trade Atlas ("GTA") published by Global Trade Information Services, Inc.  Preliminary

Decision Mem. 16, 18–19, 21–22.  GTA indexes commodity prices according to the Harmonized

Tariff Schedule ("HTS"), a system of four- to ten-digit classification codes in which longer

codes pertain to narrower classes of product.  ADM provided Commerce with GTA prices for

anthracite coal (HTS 2701.11), bituminous coal (HTS 2701.12), sulfuric acid (HTS 2807), and

limestone flux (HTS 2521).  *Id.* at 19; *see* I&D Mem. 87–90.  For each of these products, though,

ADM only gave Commerce GTA prices from a limited list of countries curated by ADM.

Preliminary Decision Mem. 16.  Besides the GTA prices, ADM also offered country-specific

prices from Platts for "various types of coal," the IMF for steam coal, ICIS for sulfuric acid, and

Metal Bulletin for ground calcium carbonate (the last for the limestone flux benchmark).  *Id.* at

16, 18–19, 22.  RZBC countered ADM's selected-country GTA submissions with a fuller suite

of GTA data for bituminous coal, sulfuric acid, and limestone flux.  RZBC also submitted

country-specific coalspot.com prices for steam coal and CRU Group prices for sulfuric acid.  *Id.*

at 17, 19, 21–22.  *See also* Pls.' Mot. for J. on the Agency R. 7.

Commerce tentatively accepted all of the parties' proposed benchmark sources except the

GTA anthracite-coal data and the Platts data hailing from Colombia, Poland, Russia, and

Australia.  Prelim. Decision Mem. 17, 19, 22.  Commerce explained, "[i]n its questionnaire

response, [RZBC] indicated that it purchased bituminous coal in the production of citric acid;

therefore, we will utilize coal prices representative of the steam coal (*i.e.*, thermal  coal)

purchased by RZBC Companies."  *Id.* at 19.[2]  For RZBC's sulfuric acid and limestone flux,

Commerce allowed all proposed prices.  *Id.* at 17, 22.  Commerce then averaged the various

benchmark prices to construct world market prices.  *Id.* at 17, 19, 22.

RZBC objected on grounds that Commerce was obligated to "only utilize export prices

on the record that clearly demarcate a quantity of shipment, particle size or other nuanced

specification reflective of [RZBC's] own specific input purchases."  I&D Mem. 90.  In support

of its objection, RZBC cited both 19 U.S.C. § 1677(5)(E)(iv) and the tier-two regulation.  RZBC

Case Br. 3–4, PD 213 (Oct. 20, 2014).  With respect to the tier-two regulation, RZBC pointed

out that the regulation instructed Commerce to make "due allowance for factors affecting

comparability" when averaging prices to construct benchmarks.  *Id.* (citing 19 C.F.R.

§ 351.511(a)(2)(ii)).  To define "factors affecting comparability," RZBC turned to the tier-one

regulation, which states that "the [s]ecretary will consider product similarity; quantities sold,

---

[2] Evidently, Commerce and the parties agree that bituminous coal is steam coal is thermal coal, whereas anthracite coal is something different.  *See, e.g.*, I&D Mem. 19; Pls.' Mot. for J. on the Agency R. 54; RZBC Rebuttal Factual Information Comments Ex. 1, PD 104 (May 1, 2014).

imported, or auctioned; and other factors affecting comparability." *Id.* (citing 19 C.F.R.

§ 351.511(a)(2)(i)).  Reading tier two in concert with tier one, RZBC deduced that "product

similarity" and "quantities sold" were both "factors affecting comparability" that Commerce was

obligated to consider when determining benchmarks.  *Id.*

      RZBC argued that only a few select benchmark sources satisfied the tier-two regulation

and the statute.  With respect to steam coal, RZBC second-guessed Commerce's rejection of

Platts data from Colombia, Poland, Russia, and Australia.  I&D Mem. 88.  According to RZBC,

these data were more specific to RZBC's inputs than the GTA data that Commerce accepted,

which were "basket" data pertaining to bituminous coal exports generally.  *Id.*  At the least, if

Commerce was going to reject Platts data from the four aforementioned countries, Commerce

should have also rejected the GTA bituminous-coal data (and, it follows, used only RZBC's

coalspot.com data to calculate the steam coal benchmark).  *Id.*

      Turning to sulfuric acid, RZBC argued that its proposed CRU Group prices were the only

prices specific to RZBC's inputs in terms of quantity and quality. *Id.*  RZBC purchased industrial

grade sulfuric acid by the tank load, and record evidence showed significant price differences

between various grades of sulfuric acid.  *Id.*  Because the CRU Group prices were specific to

bulk, industrial-grade purchases, Commerce should have used those prices.  *Id.*

      Finally, moving to limestone flux, RZBC argued that the only sufficiently specific prices

proposed by ADM were the Metal Bulletin prices pertaining to 50–22 micron limestone flux.  *Id.*

at 88–89.  The GTA data Commerce had accepted should have been excluded as basket data that

included prices for nonflux products such as bulk limestone and other calcareous material.  *Id.*

And the Metal Bulletin prices pertaining to lower micron ranges also should have been excluded

because record evidence showed that RZBC purchased 60 micron limestone flux.  *Id.*  The 50–22

micron prices fell closest to RZBC's inputs, so those were the only prices to use.  *Id.*

Commerce rejected RZBC's arguments in the Final Results.  Commerce began by noting

that, notwithstanding RZBC's citation to the tier-one regulation, the agency was setting

benchmarks under tier two.  *Id.* at 90.  In contrast to tier one, where Commerce would use

"actual transactions in the country in question" to set a benchmark, tier-two benchmarks were

supposed to represent a "world market price."  *Id.* at 90–91 (citing 19 C.F.R. § 351.511(a)(2)(i)–

(ii)).  Constructing tier-two benchmarks using prices "solely reflective of a respondent's

particularities, such as the size of its input purchases [or the inputs' grades and

specifications] . . . would detract from calculating a truly *world* market price."  *Id.* at 91.

Commerce continued, "in interpreting this tier two benchmark regulation, it is the Department's

practice to calculate a world market price that is as robust as possible in order to capture the

range of possible market prices and variances that occur when market principles govern

transactions."  *Id.*

To illustrate the perceived problem with calculating benchmarks using prices "solely

reflective of a respondent's particularities," Commerce used the sulfuric acid benchmark as an

example.  *Id.*  Were Commerce to take RZBC's advice and reject the GTA sulfuric acid price

data in favor of CRU Group prices, Commerce would have to discard

> hundreds of market prices from 64 countries in favor of 24 market prices from
> northwestern Europe, Japan and South Korea.  Limiting the abundant and available
> world market price data on the record to the few data on the record that only and
> explicitly reflect bulk shipments, results in a skewed benchmark that cannot be
> considered a *world* market price.

*Id.*

In closing, Commerce noted that world market prices calculated using GTA data were "reflective" of RZBC's "particularities" in any case:  To the extent that RZBC argued that Commerce should only use bulk-pricing data, GTA data are "collected from customs agencies around the world, and hence, represent industrial and commercial shipments of goods, which are typically large." *Id.*[3]

## B.  Discussion

The court agrees with Commerce that the agency properly selected benchmark sources for steam coal, sulfuric acid, and limestone flux.  Contrary to RZBC's argument, Commerce was not obligated to use only the narrow set of prices that RZBC identified as "specific to RZBC's inputs" in terms of grade, specification, and quantity.  Pls.' Mot. for J. on the Agency R. 41.  Under tier two, Commerce's duty is simply to make "due allowance for factors affecting comparability" when averaging benchmark prices.  19 C.F.R. § 351.511(a)(2)(ii).  This means that Commerce must at least "consider" the factors in the course of evaluating potential benchmark sources.  *ADM I*, 37 CIT at __, 917 F. Supp. 2d at 1345.  But a price can ultimately serve as a benchmark source so long as it is a "comparable market-determined price"—the priced input need not be "identical" in order for Commerce to use it.  *Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1273 (Fed. Cir. 2012).[4]

---

[3] Commerce also rejected all Platts data in the Final Results, for reasons that are unimportant for this case. *Id.* at 87.

[4] *See also Beijing Tianhai Indus. Co. v. United States*, 39 CIT __, __, 52 F. Supp. 3d 1351, 1369 (2015) (rejecting argument that Commerce erred "when it chose to average the available steel tube prices from [Italy, Iran, and Ukraine], rather than selecting the Ukranian prices" because "although Commerce must use benchmark prices for merchandise that is *comparable* to a respondent's purchases to satisfy the regulation, there is nothing that requires that it use prices for merchandise that are *identical* to a respondent's purchases"); *Archer Daniels Midland Co. v. United States*, 38 CIT __, __, 968 F. Supp. 2d 1269, 1277–78 (2014) (rejecting argument "that Commerce should use benchmarks that are more specific to the grade of sulfuric acid used by RZBC"—in particular, that Commerce should limit HTS tariff-heading price data to the ten-digit level, rather than including data from the four-, six-, and eight-digit levels—because "[t]he selected benchmarks are comparable in the sense that they all reflect world market prices for sulfuric acid (a commodity product) under [the four-digit HTS heading]" and "RZBC has

[footnote continued]

In this case, the prices Commerce used pertained to inputs that were comparable to

RZBC's.  Commerce derived its benchmarks in large part from GTA HTS data for the tariff

headings covering bituminous (or steam) coal, sulfuric acid, and limestone flux—i.e., the tariff

headings that correspond to RZBC's inputs.  Preliminary Decision Mem. 16–19, 21–22; *see* I&D

Mem. 87–90.  Commerce drew the HTS data at the four- and six-digit levels.  Preliminary

Decision Mem. 16–19, 21–22; *see* I&D Mem. 87–90.  The court has previously approved tier-

two benchmarks predicated on HTS four- and six-digit tariff-heading prices when the respondent

fails to "demonstate[] that Commerce's selection of benchmarks . . . is so distortive as to render

Commerce's benchmark calculation unreasonable."  *Archer Daniels Midland Co. v. United*

*States*, 38 CIT __, __, 968 F. Supp. 2d 1269, 1277–78 (2014).  That is precisely the case here,

because RZBC has not shown "variations in pricing" or "divisions within the [steam coal,

sulfuric acid, and limestone flux] market[s]" that would compel Commerce to deviate from the

HTS data.  *Id.* at 79.  And the remainder of Commerce's benchmark sources are also acceptable,

because those sources, like the HTS data, offer prices for the same inputs that RZBC consumed.

Commerce's benchmark sources were therefore comparable to RZBC's inputs, which is

sufficient to satisfy the tier-two regulation.

### III.   Commerce Properly Selected Benchmark Sources for Certain Land Purchases by RZBC

Commerce counted as a countervailable subsidy certain below-market land purchases that

RZBC made from the GOC in 2011.  To set a benchmark for the land purchases, Commerce

---

not demonstrated that Commerce's selection of benchmarks at the [four-, six-, and eight-]digit levels is so distortive as to render Commerce's benchmark calculation unreasonable."); *Essar Steel CIT*, 721 F. Supp. 2d at 1294 (rejecting argument that Commerce acted "contrary to law when it regarded . . . [blast-furnace-grade] iron ore fines as comparable" to plaintiff's non-blast-furnace-grade fines because "[t]he regulation requires product comparability, but does not mandate that the products be identical" and "[i]n its calculations, the Department considered differences in iron content between the [blast-furnace-grade fines] and [plaintiff's non-blast-furnace-grade] iron ore fines, and adjusted the benchmark price accordingly").

resorted to certain Thai industrial land prices.[5]  RZBC now argues that Commerce should have

used a different set of Thai prices from Colliers because those prices are "more representative of

RZBC's land purchases."  Pls.' Mot. for J. on the Agency R. 48.  The court sustains Commerce's

selection of land benchmark sources.

### A.  Background

Commerce's choice to countervail purchases of land by RZBC dates back to the review

before this one, the third review.  During the third review period, RZBC purchased the rights to

three industrial plots of land in China's Shandong province at below market value.  *RZBC Grp.*

*Shareholding Co. v. United States*, 39 CIT __, __, 100 F. Supp. 3d 1288, 1303 (2015).  Although

RZBC did not use this land in the manufacture of citric acid, Commerce countervailed the

purchases nonetheless.  *Id.*

To do so, Commerce needed to set a benchmark.  Commerce had already considered how

to set benchmarks for Chinese land purchases in *Laminated Woven Sacks from the People's*

*Republic of China*, 73 Fed. Reg. 35,639 (Dep't Commerce June 24, 2008) (final admin.

determination) ("*Laminated Woven Sacks*") and accompanying I&D Mem. at Analysis of

Programs.  In *Laminated Woven Sacks*, Commerce "determined that the most appropriate

[benchmark] . . . would be . . . the sales of certain industrial land in [Thai] industrial estates,

parks[,] and zones."  *Id.*  To get Thai industrial-land sales data, Commerce turned up a number of

"Asian Industrial Property Reports."  *Id.*  In this case's third review, Commerce followed

*Laminated Woven Sacks* and used the same kind of reports to value RZBC's land.  *See Citric*

---

[5] In the *Final Results* of the underlying review, Commerce indicated that it would use the same benchmark (and, it follows, same underlying benchmark source) as it had in the third review.  I&D Mem. 95.  In the third review, Commerce used a set of Thai industrial land prices. *See Citric Acid and Certain Citrate Salts from the People's Republic of China*, 79 Fed. Reg. 108 (Dep't Commerce Jan. 2, 2014) (final admin. review) and accompanying I&D Mem. at 28.

*Acid and Certain Citrate Salts from the People's Republic of China*, 78 Fed. Reg. 34,648 (Dep't

Commerce June 10, 2013) (prelim. admin. review) ("*Citric Acid and Certain Citrate Salts Third*

*Review Preliminary Determination*") and accompanying Preliminary Results Calculation

Memorandum for RZBC 8, *unchanged in Citric Acid and Certain Citrate Salts from the People's*

*Republic of China,* 79 Fed. Reg. 108 (Dep't Commerce Dec. 7, 2009) (final admin. review)

("*Citric Acid and Certain Citrate Salts Third Review Final Determination*") and accompanying

Final Results Calculation Memorandum for RZBC 2–3.  Commerce merely replaced the

outdated reports from *Laminated Woven Sacks* with four new reports pertaining to the four

quarters of 2010 (the third review period).    The new reports were titled a bit differently, as the

Asian Marketview Reports.

In the fourth review (the one at issue in this case), RZBC sought for Commerce to use a

different source for the land benchmarks.  Specifically, RZBC proposed that Commerce use two

Industrial Real Estate Market Reports, published by Colliers in the first and second halves of

2012.  RZBC Benchmark Submission Ex. 25, PD 97 (Apr. 21, 2014).  According to RZBC, the

Colliers reports would form better benchmarks because they were "more representative of the

actual land purchased by [RZBC]" because they included "industrial land prices from 13

provinces in Thailand, rather than the single price from the province of Bangkok [offered by the

Asian Marketview Reports] which is clearly not representative of [RZBC's] land purchases."

I&D Mem. 94.  RZBC also argued that the Colliers reports were more contemporaneous to the

POR than the Asian Marketview Reports.  *Id.*

Commerce declined RZBC's invitation to use the Colliers reports to set benchmarks.

Commerce reasoned that the data from the Colliers reports was "not transaction-specific and

therefore [was] not reliable." *Id.* at 95.  By contrast, the Asian Marketview Reports selected by

Commerce in the third review "used actual transaction prices." *Id.* Commerce also noted that

RZBC was wrong about the breadth of the Asian Marketview data:  Far from being comprised of

"a single price from the province of Bangkok," the data included "36 price points from five

provinces within Thailand." *Id.* Finally, Commerce added that RZBC failed to demonstrate that

"(1) our land benchmark is not comparable to their land purchase[, and] (2) price points from

seven additional provinces would make the benchmark more representative." *Id.*

### B.  Discussion

RZBC renews its ask for a Colliers-based benchmark before this court.  RZBC argues

that the five provinces covered by the third-review reports are all "around Bangkok," but that

Commerce "failed to address how [those five provinces] are similar to RZBC's land

purchases[, which] are located far away from any major city center."  Pls.' Mot. for J. on the

Agency R. 48.  Given that the Colliers reports draw data from thirteen provinces (including

lower priced areas far from Bangkok), it is unclear to RZBC how Commerce's current

benchmarks are "more representative" than their Colliers-based counterparts. *Id.* Commerce

preferred the Asian Marketview Reports because they reported "actual transactions" whereas the

Colliers reports were "not transaction-specific," but RZBC argues that this does nothing to prove

that the Asian Marketview Reports better represent RZBC's land purchases. *Id.*

Besides, RZBC questions whether the Asian Marketview Reports really are specific to

"actual transactions." *Id.* at 47–48.  RZBC says it cannot see for itself whether the Asian

Marketview Reports are transaction specific because Commerce did not bother to put the reports

on record. *Id.* at 48.  RZBC also notes that the Asian Marketview Reports list pricing data in

U.S. dollars, which suggests that the data are not specific to actual Thai transactions. By contrast,

the Colliers reports list data in Thai Bhat, "which would seem to indicate that the reported

price[s] are based on actual Thai rates." *Id.*

RZBC's arguments miss the mark. Commerce's primary reason for using the Asian

Marketview Reports was that the reports' transaction specificity made them reliable in a way that

the non–transaction specific Colliers reports were not. I&D Mem. 95. Contrary to RZBC's

arguments, there was sufficient indication that the Asian Marketview Reports really are

transaction specific, and transaction specificity was a good enough reason for the agency to

prefer the Asian Marketview Reports over the Colliers ones.

To begin with, Commerce sufficiently demonstrated that the Asian Marketview Reports

are transaction specific. Although Commerce did not place the Asian Marketview Reports on

this review's record, Commerce supported its statement that the reports were transaction specific

with a citation to the third review—where the reports were on record (and also evidently

available online). *Id.*; *Citric Acid and Certain Citrate Salts Third Review Preliminary

Determination*, at 34,648 and accompanying Preliminary Results Calculation Memorandum for

RZBC 8. Given that RZBC was a party to the third review and therein contested Commerce's

decision to countervail RZBC's land purchases, *see Citric Acid and Certain Citrate Salts Third

Review Final Determination*, at 108 and accompanying I&D Mem. 64–65, the argument that

RZBC could not access the Asian Marketview Reports to confirm that they were transaction

specific comes across as disingenuous.

The court adds that besides putting the Asian Marketview Reports on record in the third

review, Commerce also specified that it had used the reports to form benchmarks in several past

proceedings, starting with *Laminated Woven Sacks*. *Citric Acid and Certain Citrate Salts from

the People's Republic of China*, 78 Fed. Reg. 34,648 and accompanying Preliminary Results

Calculation Memorandum for RZBC 8.  In the *Laminated Woven Sacks* preliminary

determination, Commerce stated that the reports offered prices for "the sales of certain industrial

land in industrial estates, parks and zones in Thailand."  *Laminated Woven Sacks from the*

*People's Republic of China*, 72 Fed. Reg. 67,893, 67,909 (Dep't Commerce Dec. 3, 2007)

(prelim. admin. determination).  Commerce continued by noting that the Asian Marketview

prices came from "an independent and internationally recognized real estate agency with a long-

established presence in Asia."  *Id.*  The description of Asian Marketview Reports as pertaining to

"sales" from a "real estate agency" clearly indicates that the reports are transaction specific.  The

language of the *Laminated Woven Sacks* preliminary determination plus Commerce's reference

to the third review, where the Asian Marketview Reports were on record, is sufficient to

demonstrate that the reports are transaction specific.

      And the fact that the Asian Marketview Reports are transaction specific is enough to

justify their use over the non–transaction specific Colliers reports.  There is a common-sense

reason that non–transaction specific price reports are "not reliable," I&D Mem. 95, in the same

way as their transaction-specific counterparts:  Transaction-specific reports provide the

opportunity to identify and compensate for outlier sales, whereas non–transaction specific reports

do not.  Commerce's own regulations reflect a preference for drawing benchmarks from

transaction-specific sources.  Under 19 C.F.R. § 351.511(a)(2), Commerce first tries to calculate

benchmarks using "actual transactions in the country in question" before resorting to the second

and third tiers.  Commerce therefore had ample basis for finding the Colliers reports unreliable

and for using the Asian Marketview Reports to generate benchmarks instead.[6]

---

[6] RZBC also argues that Commerce should not have countervailed RZBC's land purchases in the first place.  The court already rejected this argument in *RZBC*, 39 CIT at __, 100 F. Supp. 3d at 1304.
    Finally, RZBC argues that using the Colliers reports would be more "cons[ist]ent with the determinations
                                            [footnote continued]

**IV.    Commerce Properly Calculated the International Freight Component of the Limestone Flux Benchmark**

In accordance with 19 C.F.R. § 351.511(a)(2)(iv), Commerce adjusted its limestone flux benchmarks to reflect the price an importer of limestone flux would pay, including international freight.   Commerce arrived at its chosen freight rate by averaging three sets of international shipping quotes that the parties had provided, one of which pertained to shipping in "flat-rack collapsible" containers.  I&D Mem. 25; ADM Benchmark Submission Ex. 4, PD 96 (Apr. 21, 2014); RZBC Benchmark Submission Ex. 22, PD 103 (Apr. 21, 2014).  The flat-rack quotes included a "special equipment service" surcharge over and above the cost of shipping in standard containers.  ADM Benchmark Submission Ex. 4.  RZBC argues that Commerce should have omitted the surcharge, because limestone flux could be shipped in standard containers.  The court sustains Commerce's freight-rate calculation.

**A.  Background**

19 C.F.R. § 351.511(a)(2)(iv) instructs Commerce to adjust its benchmarks "to reflect the price that a firm actually paid or would pay if it imported the product."  The regulation further provides that "[t]his adjustment will include delivery charges and import duties."

As freight-rate fodder, RZBC provided shipping quotes from Maersk and Searates. RZBC Benchmark Submission Ex. 22.  The Maersk quotes referenced the shipment of "salt, [S]ulpher, earths and stone, plastering materials, lime, cement, marble, [and] granite" in "standard" containers.  *Id.*  ADM also provided Maersk shipping quotes, but ADM's quotes pertained to flat-rack collapsible containers, as opposed to standard ones, and included the

---

made by this Court in *Zhaoqing New Zhongya Aluminum Co. v. United States* [(*Zhaoqing I*), 37 CIT __, __, 929 F. Supp. 2d 1324 (2013)] and *Zhaoqing New Zhongya Aluminum Co. v. United States* [(*Zhaoqing II*), 38 CIT __, __, 961 F. Supp. 2d 1346, 1352 & n.8 (2014)]."  The court will not consider this argument because RZBC did not raise it below.  RZBC Case Br. 19–20; *see* 28 U.S.C. § 2637(d) ("[T]he Court of International Trade shall, where appropriate, require the exhaustion of administrative remedies.").

aforementioned surcharge.  ADM Benchmark Submission Ex. 4.  Commerce averaged all three

sets of shipping quotes in the Preliminary Results without first removing the surcharge from the

flat-rack quotes.  Preliminary Decision Mem. 22.

RZBC objected to Commerce's inclusion of the surcharge in the three-set average.

RZBC argued that including the "special equipment service" surcharge in the average stood "in

sharp contrast to every other case where the 'flat rack collapsible container rates' were placed on

the record."  I&D Mem. 80.  According to RZBC, in two prior proceedings, Commerce had

omitted the surcharge on grounds that the record lacked evidence that flat-rack containers were

required to ship the relevant input—in those proceedings, steel-round billets.  *See id.* at 80 &

n.423 (citing *Certain Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from

the People's Republic of China,* 75 Fed. Reg. 57,444 (Dep't Commerce Sept. 21, 2010) (final

admin. determination) ("*Seamless Carbon and Alloy Steel Pipe*") and accompanying I&D Mem.

cmt. 9.C; *Oil Country Tubular Goods from the People's Republic of China,* 78 Fed. Reg. 9368

(Dep't Commerce Feb. 8, 2013) (prelim. admin. review) ("*Oil Country Tubular Goods

Preliminary Administrative Review*") and accompanying I & D Mem. cmt. 1.A).  Moreover,

RZBC placed on record quotes for shipping limestone flux in standard containers, the very

existence of which suggested that flat-rack containers were not necessary.  *Id.*

Commerce did not accept RZBC's arguments in the final results.  Commerce succinctly

explained,

> In [*Oil Country Tubular Goods* (one of the proceedings relied upon by RZBC),]
> there was sufficient information on the record . . . to conclude that the respondent
> did not incur the "flat rack" "special equipment service" fee.  However, in the
> instant review, [RZBC] did not provide information on the record that it does not
> incur these fees; therefore, we will continue to use the international freight pricing
> data on record and will not make any changes for the final results.

*Id.* at 80–81.

### B. Discussion

The court upholds Commerce's decision to factor the "special equipment service" surcharge into its limestone flux international-freight rate.  Based on the record evidence, the court cannot conclude that it would be inappropriate to import limestone flux in flat-rack containers.  The standard-container quotes on record do not delineate the usual use cases for standard-container shipment of limestone flux, much less establish that standard-container shipment is always feasible.  *See* RZBC Benchmark Submission Ex. 23.  The same is true of another piece of evidence invoked by RZBC in its reply brief: a Wikipedia article that lists "Bulk minerals," including "limestone," as commodities shippable in unpackaged, standard-container form.  RZBC Benchmark Submission Ex. 19, PD 103 (Apr. 22, 2014).  The article simply establishes that shipping limestone flux in standard containers is sometimes suitable, not that it is always suitable.  *Id.*  Without evidence that limestone flux is invariably shipped in standard containers, the court cannot rule out the possibility that flat-rack shipment is sensible or necessary at least some of the time.  Therefore, it was not unreasonable for Commerce to calculate the freight-rate average without first omitting the "special equipment service" surcharge.[7]

---

[7] RZBC again argues that this result is inconsistent with prior proceedings in which Commerce omitted the "special equipment service" surcharge from the freight-rate average for steel-round billets.  But the proceedings that RZBC cites all follow the final determination in the *Oil Country Tubular Goods* investigation, where the record included "evidence that no special services were needed to ship steel billets and rounds."  *RZBC*, 39 CIT at __, 100 F. Supp. 3d at 1313 n.7 (2015) (citing *Certain Oil Country Tubular Goods from the People's Republic of China,* 74 Fed.Reg. 64,045 (Dep't Commerce Dec. 7, 2009) (final admin. determination) ("*Oil Country Tubular Goods Final Determination*") and accompanying I&D Mem. cmt. 13.D; *Oil Country Tubular Goods Preliminary Administrative Review,* at 9368 and accompanying I&D Mem. at 1.A (relying on *Oil Country Tubular Goods Final Determination* to hold that shipping steel-round billet did not incur a "special equipment service" surcharge); *Seamless Carbon and Alloy Steel Pipe* at 57,444 and accompanying I&D Mem. cmt. 9.C (same)).  In particular, the *Oil Country Tubular Goods Final Determination* record included a shipper's statement that "[s]teel billet shipments for our customers . . . were not made using flat rack containers."  The record in this case, like the record before the court in the preceding *RZBC* case, is bereft of any comparable evidence that shipping limestone flux in flat-rack collapsible containers was inappropriate.

## CONCLUSION AND ORDER

After carefully reviewing the parties' briefs and the administrative record, the court

remands Commerce's decision to adversely infer that RZBC used the Buyer's Credit program.

The court sustains Commerce's benchmark calculations in full.

Accordingly, it is hereby:

**ORDERED** that the final determination of the International Trade Administration, United States Department of Commerce, published as *Citric Acid and Certain Citrate Salts from the People's Republic of China*, 79 Fed. Reg. 78,799 (Dep't Commerce Dec. 31, 2014) (final admin. review), be, and hereby is, REMANDED to Commerce for redetermination; it is further

**ORDERED** that Plaintiffs' Motion for Judgment on the Agency Record Under USCIT Rule 56.2 be, and hereby is, GRANTED as provided in this Opinion and Order; it is further

**ORDERED** that Commerce shall issue a redetermination ("Remand Redetermination") in accordance with this Opinion and Order that is in all respects supported by substantial evidence and in accordance with law; it is further

**ORDERED** that Commerce shall reconsider whether it can verify RZBC's non-use of the Buyer's Credit program by inspecting RZBC's audited financial statements or other books and records for sales contracts valued over $2 million; it is further

**ORDERED** that if Commerce concludes that it cannot verify non-use with RZBC, then it must explain how this can be the case in light of the $2 million threshold laid out in the *Administrative Measures*; it is further

**ORDERED** that if Commerce concludes that it can verify non-use with RZBC, then it must either attempt to do so or explain why not; it is further

**ORDERED** that Commerce shall recalculate Plaintiffs' countervailing duty rate consistent with the results of its reconsideration; it is further

    **ORDERED** that Commerce shall have ninety (90) days from the date of this Opinion and Order in which to file its Remand Redetermination, which shall comply with all directives in this Opinion and Order; that the Plaintiffs and Defendant-Intervenors shall have thirty (30) days from the filing of the Remand Redetermination in which to file comments thereon; and that the Defendant shall have thirty (30) days from the filing of Plaintiffs' and Defendant-Intervenors' comments to file comments.


<u>/s/ Richard W. Goldberg</u>
Richard W. Goldberg
Senior Judge

Dated: June 30, 2016
New York, New York