Slip Op. 17-40

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| RZBC GROUP SHAREHOLDING CO., LTD., RZBC CO., LTD., RZBC IMP. & EXP. CO., LTD., and RZBC (JUXIAN) CO., LTD., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> ARCHER DANIELS MIDLAND COMPANY, CARGILL, INCORPORATED, and TATE & LYLE INGREDIENTS AMERICAS LLC, <br><br> Defendant-Intervenors. | Before: Richard W. Goldberg, Senior Judge <br> Court No. 15-00022 |

**OPINION AND ORDER**

[The court sustains Commerce's decisions.]

Dated:   April 10, 2017

*Michael S. Holton* and *Jeffrey S. Neeley*, Husch Blackwell LLP, of Washington, DC, for plaintiffs.

*Patricia M. McCarthy*, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for defendant.  With her on the brief were *Meen Geu Oh*, Trial Attorney, *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, and *Jeanne E. Davidson*, Director.  Of counsel on the brief was *Emma T. Hunter*, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

*Stephen A. Jones* and *Patrick J. Togni*, King & Spalding LLP, of Washington, DC, for defendant-intervenors.

Goldberg, Senior Judge:  This case concerns challenges to the fourth administrative

review of a countervailing duty order on citric acid and certain citrate salts from the People's

Republic of China (the "PRC").  *See Citric Acid and Certain Citrate Salts from the People's*

*Republic of China*, 79 Fed. Reg. 78,799 (Dep't Commerce Dec. 31, 2014) (final admin. review)

("*Final Results*") (covering imports from January 1, 2012 to December 31, 2012).

Plaintiffs RZBC Group Shareholding Co. and related companies ("RZBC") moved for

judgment on the agency record under USCIT Rule 56.2.  Mem. of Law in Supp. of Pls. Mot. for

J. on Agency R. Under USCIT R. 56.2, ECF No. 29 ("RZBC Br.").  On June 30, 2016, this court

resolved RZBC's motion by remanding for reconsideration a single issue to the U.S. Department

of Commerce ("Commerce"): whether Commerce can avoid the application of adverse facts

available ("AFA") by using RZBC's records to verify non-use of the Buyer's Credit program.

*RZBC Group Shareholding Co. v. United States*, Slip Op. 16-64, 2016 WL 3880773, at *14 (CIT

June 30, 2016).  In the ensuing remand, Commerce maintained that it cannot verify non-use with

RZBC.  Final Results of Redetermination Pursuant to Ct. Remand, ECF No. 56-1 ("Remand

Results").

RZBC now contends that the Remand Results are incorrect.  Pls. Comments on Remand

Results, ECF No. 62 ("RZBC Comments").  Alternatively, RZBC insists that, if the Remand

Results are correct, Commerce nevertheless erred in calculating a 10.54% AFA rate.  *Id.*

Defendant-Intervenors, Archer Daniels Midland Company, Cargill, Incorporated, and Tate &

Lyle Ingredients Americas LLC ("ADM"), insist that Commerce made no errors.  Def.-

Intervenor's Comments in Supp. of Remand Redetermination, ECF No. 64; Def.-Intervenor's

Resp. in Opp'n to Pls. Mot. for J. on Agency R., ECF No. 37.  After carefully reviewing the

briefs and record, the court sustains Commerce's determinations on both issues.

## GENERAL BACKGROUND

The court assumes familiarity with the facts and law as discussed in its prior opinion and briefly summarizes details relevant to reviewing the issues now before the court.

Countervailing duties ("CVDs") exist to offset the net benefit received from a foreign government's subsidy.  19 U.S.C. § 1671(a).  In the review at issue, Commerce imposed a 17.55% CVD rate.  *Final Results*, 79 Fed. Reg. at 78,800.  "With this duty, Commerce aimed to offset the benefit RZBC received from concessional loans, steam coal, sulfuric acid, limestone flux, land purchases, and other subsidies from the PRC."  *RZBC*, Slip Op. 16-64, 2016 WL 3880773, at *1; I&D Mem. 14–32, PD 226 (Dec. 23, 2014).

To ascertain the above CVD rate, "Commerce adversely inferred that RZBC benefited from the Buyer's Credit program, a concessional-loan program instituted by the Government of China ("GOC") owned EXIM Bank.  I&D Mem. 75."  *RZBC*, Slip Op. 16-64, 2016 WL 3880773, at *2.  Commerce based the decision to apply AFA on the GOC's noncooperation in refusing to allow Commerce to access information necessary for verifying non-use of the program.  I&D Mem. 73–75.  Commerce ascribed an AFA rate of 10.54%.  *Id.*

Among other arguments in its subsequent appeal to this court, RZBC first argued that Commerce erred when adversely inferring that RZBC benefited from the Buyer's Credit program.  RZBC Br. 2.  Second, RZBC argued that, even if Commerce was correct to adversely infer that RZBC benefited from the program, Commerce incorrectly calculated the AFA rate of 10.54%.  *Id.* at 2–3.  In its opinion on June 30, 2016, this court remanded the first issue and reserved judgment on the second issue.  *RZBC*, Slip Op. 16-64, 2016 WL 3880773, at *6 & n.1.

With regard to the first issue—the application of AFA—the court found that the GOC had in fact failed to cooperate to the best of its ability.  *Id.* at *4.  Nonetheless, the court also held

that "Commerce's obligation when drawing an adverse inference based on a lack of cooperation

by a foreign government is to avoid collaterally impacting respondents to the extent practicable

by examining the record for replacement information." *Id.* at *5.  The court then explained that

"Article 5 of the *Administrative Measures* suggests that the Buyer's Credit program is

unavailable with respect to sales contracts under $2 million." *Id.* at *6 (citing GOC NSA Resp.

Ex. C-1, at art. 5, PD 78 (Mar. 19, 2014)).  Further, "[a]s far as the court [was] aware, no other

evidence on the record contradicts Article 5's $2 million dollar requirement during the period of

review." *Id.*  "And when Commerce asked whether RZBC had 'signed any single sales contract

exceeding two million U.S. dollars for a sale that included, in whole or in part, subject

merchandise to the United States,' the company said no." *Id.* (citing I&D mem. 73; RZBC NSA

Resp. 9, PD 76 (Mar. 19, 2014)).  In light of this record evidence, the court concluded that

"Commerce never explained why it could not verify RZBC's non-use of the Buyer's Credit

program by checking the firm's audited financial statements or other books and records for the

value of RZBC's sales contracts." *Id.* at *4.  Given that Commerce "had an obligation to heed

any verifiable evidence that RZBC never used the Buyer's Credit program," Commerce should

have tried to verify non-use by examining "the firm's audited financial statements or other books

and records for the value of RZBC's sales contracts." *Id.*  The failure to do so rendered the

application of AFA unsupported by substantial evidence. *Id.*  The court then provided the

following directives on remand:

> Commerce must reconsider whether it can verify RZBC's non-use of the Buyer's Credit
> program by inspecting RZBC's audited financial statements or other books and records
> for sales contracts valued over $2 million.  If the agency continues to conclude that
> verifying non-use with RZBC is impossible, then it must explain how this can be the case
> in light of the $2 million threshold laid out in the *Administrative Measures*.  If, on the
> other hand, Commerce concludes that RZBC is in a position to verify non-use, then the
> agency must either make an attempt at doing so or explain why not.

*Id.* at *6.

On remand, Commerce continued to find that it cannot verify non-use with RZBC and, therefore, Commerce continued to apply AFA. Remand Results 2. As explained below, the court sustains that decision. The court also addresses the issue on which it reserved judgment in the June 30 opinion—the 10.54% AFA rate—and likewise sustains Commerce's rate decision.

## JURISDICTION AND STANDARD OF REVIEW

This court has jurisdiction under 28 U.S.C. § 1581(c). The court will sustain Commerce's results unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (citation omitted). In other words, "substantial evidence" "can be translated roughly to mean 'is [the determination] unreasonable?'" *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006) (citation omitted). The court also reviews Commerce's Remand Results for "compliance with the court's remand order." *Tai Shan City Kam Kiu Aluminum Extrusion Co. v. United States*, 39 CIT __, __, 125 F. Supp. 3d 1337, 1341 (2015) (citation omitted).

## DISCUSSION

For the reasons set forth below, the court sustains Commerce's decision to apply AFA. In addition, the court considers and sustains Commerce's decision to use a 10.54% AFA rate.

## I.     The Court Sustains the Decision to Apply AFA.

Substantial evidence supports Commerce's decision to apply AFA on remand. Moreover, the decision to apply AFA complies with both the law and this court's remand order.

In its Remand Results, Commerce continued to apply an adverse inference that RZBC

benefited from the Buyer's Credit program.  Remand Results 2.  Commerce made this

determination because the "decree governing the Buyer's Credit program is ambiguous."  *Id.* at

4.  Accordingly, "reviewing the RZBC Companies' contracts will not conclusively illuminate

whether or not its customers used the Buyer's Credit program."  *Id.*

Commerce provides two primary reasons for its determination that the conditions of the

Buyer's Credit program are ambiguous.

First, Commerce focuses on the language in the *Administrative Measures*.  Commerce

concedes that the GOC stated that, "[a]ccording to the *Administrative Measures*, the contract

value shall exceed USD 2 million."  *Id.* (citing GOC NSA Resp. 17).  But Commerce argues that

the translation of the *Administrative Measures* that the GOC provided contradicts the GOC's

statement that the $2 million threshold is mandatory.  *Id.* at 4–5.  Article 5 of the *Administrative*

*Measures* reads:

> The business contract supported by export buyer's credit must be recognized by EIBC
> and meet the following basic conditions:
> > i. contract amount **should** be over 2 million dollars; ii. the Chinese components
> > contained in exported goods **shall** not [be] less than 50%; iii. the proportion of cash
> > payment paid by importer **generally** is not less than 15% of contract value, and
> > such payment for ship projects **shall** not [be] less than 20% of the contract value.

GOC NSA Resp. Ex. C-1, at art. 5 (emphasis added).  Based on this translation, Commerce

determined that the "word 'should' does not establish a minimum requirement, therefore making

the minimum contract value discretionary [and not mandatory].  Moreover, the GOC's

translation of the *Administrative Measures* demonstrates that the usage of 'should' in Article 5(i)

was intentional because the subsequent two program conditions utilize the term 'shall.'"

Remand Results 5.  From this, Commerce concluded that, "notwithstanding the language in the

GOC's narrative response, a more complete examination of the GOC's response indicates that what is required under the program's first condition is ambiguous." *Id.*

Second, Commerce asserts that "other record evidence relating to [the Buyer's Credit program] was likewise unclear as to the minimum amount required for" program eligibility. *Id.* Commerce cites two working papers that discuss concessional loans by EXIM Bank. *Id.* The papers suggest that the terms of EXIM Bank's concessional loans are ambiguous or discretionary. *Id.* Commerce also cites Article 9 of the *Administrative Measures*, which states: "the loan currency shall be Dollar or other currencies approved by [EXIM Bank.]" *Id.* (citation omitted). Commerce explains that, "[i]f the currency denomination is not established, then the minimum contract or loan amount can fluctuate pursuant to the exchange rate, creating yet more ambiguity as to how [Commerce] can identify a clear and consistent avenue to conduct a verification of RZBC Companies' sales contracts and other books and records." *Id.* at 11. To Commerce, this "evidence is relevant to [its] finding that the program's minimum sales contract requirement is ambiguous." *Id.* at 5–6.

Based on Commerce's first argument alone, the court finds that the above determination is supported by substantial evidence and is consistent with both the law and this court's remand order. The $2 million threshold is ambiguous, and for that reason Commerce cannot ensure non-use of the Buyer's Credit program simply by examining the value of RZBC's contracts. Nevertheless, RZBC offers a number of unconvincing reasons that this court should send the issue back to Commerce. The court briefly considers each in turn.

First, RZBZ claims that "Commerce's redetermination is outside the scope of the Remand Order." RZBC Comments 3. In the remand order, the court explained that, "as far as the court [was] aware," nothing in the record "contradicts Article 5's $2 million" threshold

requirement.  *RZBC*, Slip Op. 16-64, 2016 WL 3880773, at *6.  The court then ordered

Commerce to either (1) use RZBC's records to "verify RZBC's non-use of the Buyer's Credit

program" or (2) explain why it cannot verify non-use in this way.  *Id.*  In its Remand Results,

Commerce explained why it cannot use RZBC's records to verify non-use.  Thus, Commerce

complied with the remand order.

       Second, RZBC argues that Commerce's failure to consider the $2 million threshold

requirement prior to the Remand Results, "whether pursuant to 19 U.S.C. § 1677m(d) or through

additional questions concerning RZBC's certified claims, means the evidence on the record from

RZBC and the GOC regarding the threshold is undisputed and Commerce's *Redetermination* is

not supported by substantial evidence."  RZBC Comments 9.  In response, Commerce explained

that it "attempted to clarify any ambiguities with regard to the requirements and administration

of the Buyer's Credit program; however, it was denied that opportunity when the GOC refused to

provide the requested information, *i.e.*, 'sample contracts and documentation that would help

[Commerce] understand the disbursement of funds and its timeline.'"  Remand Results 7–8

(citation omitted).  Commerce then asserts that it cannot find a $2 million threshold requirement

simply because the GOC and RZBC promised that such a requirement exists, especially when, as

here, the "certified translation provided by the GOC" contradicts the promises.  *Id.* at 8.

Commerce's explanation is reasonable and RZBC's argument is unconvincing.[1]

---

[1] RZBC also argues the following: "Not only was Commerce silent with respect to the statements by the
parties concerning the $2 million contract threshold requirement, but itself 'manifested a belief, by its words and
conduct, in the statement's truth' when it asked RZBC whether it had any contracts over the $2 million contract
threshold."  RZBC Comments 9 (citation omitted).  Commerce explained that its question "was not indicative of a
finding by [Commerce] that the program in fact had such a requirement, but rather was an inquiry into the
requirements and administration of the program as applicable to the RZBC Companies based on information
available at the time" Commerce issued the question.  Remand Results 8.  Commerce is correct.  Asking if RZBC
had contracts over $2 million is not tantamount to declaring that the Buyer's Credit program includes a $2 million
mandatory threshold.  For this reason, the court also rejects RZBC's request for the court to remand Commerce's
determinations "under the equitable doctrine of judicial estoppel."  RZBC Comments 18.

Third, RZBC argues that Commerce erred in failing to "review the full translation of Article 5" of the *Administrative Measures*.  RZBC Comments 9.  Had it done so, RZBC contends, it would have found that the provision unambiguously creates a mandatory $2 million threshold.  *Id.* at 10.  As stated above, Article 5 begins: "The business contract supported by export buyer's credit must be recognized by EIBC and meet the following basic conditions." GOC NSA Resp. Ex. C-1, at art. 5.  It then states (i) that the contract "should be over 2 million dollars," (ii) that "the Chinese components contained in exported goods shall not [be] less than 50%," and (iii) that "the proportion of cash payment[s] . . . for ship projects shall not [be] less than 20% of the contract value."  *Id.*  RZBC maintains that the phrase "'meet the following basic conditions' is the 'shall' requirement and supersedes the so-called 'should' that Commerce alleges to be ambiguous."  RZBC Comments 10.  Yet this does nothing to remove, and in fact amplifies, the ambiguity in the *Administrative Measures*.  So this argument is likewise unavailing.

Fourth, RZBC argues that "Commerce's *Redetermination* is based on *new factual* findings which pursuant [to] 19 C.F.R. § 351.301(c)(4) provided RZBC with the opportunity to rebut, clarify, or correct Commerce's *new factual* statement concerning the *Administrative Measures*."  RZBC Comments 16.  For this reason, on remand "RZBC submitted an updated translation that is clearer regarding the meaning of the Chinese version in English to correct Commerce's misunderstanding of the inclusion of 'should' in the translation of part (i) of Article 5 that simply is not found in the Chinese language on the record."  *Id.*  Commerce rejected the new translation as untimely new factual information.  Remand Results 12.  RZBC insists that this was an error and requests a remand to correct it.

But Commerce did not err.  Under 19 C.F.R. § 351.301(c)(4), a party "is permitted one

opportunity to submit factual information to rebut, clarify, or correct factual information placed

on the record of the proceeding by" Commerce.  "Factual information" is "[e]vidence, including

statements of fact, documents, and data placed on the record by" Commerce."  19 C.F.R. §

351.102(b)(21)(iv).  "RZBC believes that this *new* finding by Commerce that the minimum

contract value for the Buyer's Credit program is 'discretionary' is a new factual statement

pursuant to" 19 C.F.R. § 351.102(b)(21)(iv).  RZBC Comments 17.  As a result, RZBC contends

that, under 19 CFR § 351.301(c)(4), it should have been "given the opportunity to" submit an

alternative translation to "rebut, clarify, or correct Commerce's new factual statement concerning

the *Administrative Measures*."[2]  *Id.* at 17–18.  Commerce argued that it "did not place any

'evidence, including statements of fact, documents and data,' on the record of this remand

proceeding.  Rather, [it] made a preliminary, and now final, *determination* based on factual

information previously submitted in the course of the administrative review."  Remand Results

13.  This, Commerce concludes, "does not trigger the factual information deadline of" 19 C.F.R.

§ 351.301(c)(4).  *Id.*  The court agrees.  Commerce offered no new evidence; it offered a new

conclusion on old evidence.  Thus, the court finds that Commerce did not err in rejecting the new

translation.[3]

---

[2] RZBC also separately argues that the new translation was not "*new* factual information."  RZBC Comments 17.  In its Remand Results, Commerce concluded that "translations of factual information submitted in a foreign language [are] factual information."  Remand Results 12.  Commerce's conclusion is reasonable, and RZBC provides no authority to show that Commerce's conclusion is incorrect.

[3] What is more, as Commerce correctly explained, RZBC had an opportunity to submit an alternative translation.  The GOC submitted its translation of Article 5 of the *Administrative Measures* in its questionnaire response on March 19, 2014. Remand Results 12.  19 C.F.R. § 351.301(c)(1)(v) allowed RZBC to submit information (*i.e.*, a translation) "to rebut, clarify, or correct [the GOC's] questionnaire responses."  RZBC failed to do so.

In short, the court finds that Commerce offered substantial evidence to support a decision

to apply AFA that was consistent with the law and the remand order.[4]

## II.     The Court Sustains the 10.54% AFA Rate.

RZBC next insists that, if Commerce acted properly in applying AFA, it nevertheless

acted improperly in determining the AFA rate.  RZBC provides a list of reasons that the 10.54%

rate lacks the support of substantial evidence and violates the law.  The court finds otherwise.

### A.  Background

19 U.S.C. § 1677e governs Commerce's selection of information for calculating an AFA

rate in CVD proceedings.  Commerce can rely on information from (1) "the petition," (2) "a final

determination in the investigation under this subtitle," (3) "any previous review under section

1675 of this title or determination under section 1675b of this title," or (4) "any other

information placed on the record."  *Id.* § 1677e(b)(2).

Under § 1677e(c), Commerce must corroborate any secondary information relied on to

calculate the AFA rate.  Specifically, when, as here, Commerce "relies on secondary information

rather than on information obtained in the course of an investigation or review, . . . [Commerce]

shall, to the extent practicable, corroborate that information from independent sources that are

reasonably at [its] disposal."  § 1677e(c)(1); *see also* Statement of Administrative Action

("SAA"), H.R. Doc. No. 103–316, vol. 1., at 870 (1994).  To "corroborate" the information,

Commerce must "examine whether the secondary information to be used has probative value."

19 C.F.R. § 351.308(d).  This entails "examining the reliability and relevance of the

---

[4] In addition, RZBC attacks Commerce's use of the working papers.  RZBC Comments 11–12.  Moreover, RZBC insists that, if Commerce considered Article 9 of the *Administrative Measures*, Commerce should have also considered Articles 2 and 6 of the *Administrative Measures*, which allegedly indicate that RZBC could not have benefited from the Buyer's Credit program.  *Id.* at 15–16.  The court does not address this argument because, even if Commerce improperly used the working papers and Article 9 to support its finding, Commerce had substantial alternative evidence for concluding that the $2 million threshold is ambiguous and potentially discretionary.

information." *Mittal Steel Galati S.A. v. United States*, 31 CIT 730, 734, 491 F. Supp. 2d 1273, 1278 (2007).

In corroborating its information, Commerce need not prove that it chose the best information.  SAA 869–70.  That said, "[t]he sources used to calculate an AFA rate should 'be a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to noncompliance.'" *Essar Steel, Ltd. v. United States*, 753 F.3d 1368, 1373 (Fed. Cir. 2014) (citation omitted).

Here, Commerce began its explanation by summarizing its method for calculating an AFA rate in a CVD proceeding in the PRC:

> [Commerce] has an established practice for selecting AFA rates for programs for which no verified usage information was provided.  According to that practice, for programs other than those involving income tax exemptions and reductions, we will apply the highest calculated rate for the identical program in the same proceeding if another responding company used the identical program.  If no other company used the identical program within the proceeding, we will use the rate from the identical program in another CVD proceeding involving the country under investigation, unless the rate is *de minimis*.  If there is no identical program match in any CVD proceeding involving the country under investigation, we will use the highest rate calculated for a similar program in another CVD proceeding involving the same country.

I&D Memo 75.  No party disputes Commerce's explanation of the practice that was in effect at the time of the review.

Commerce next reasoned that, because it "has not calculated a rate for the Export Buyer's Credits program in this review, and has not calculated a rate for the program in another CVD PRC proceeding, [Commerce's] practice is to identify the highest rate calculated for a similar program in another CVD PRC proceeding."  *Id.*  Commerce determined "that a lending program is similar to the program at issue because the credits function as short-term or medium-term

loans."[5]  *Id.*  From this, Commerce concluded "that the highest calculated rate for a comparable lending program is 10.54 percent calculated for preferential policy lending in" *Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses From the People's Republic of China*, 75 Fed. Reg. 70,201 (Dep't Commerce Nov. 17, 2010) (amended final determ.) ("*Coated Paper from the PRC*").  *Id.*  To corroborate its finding, Commerce explained:

> In this case, the preferential policy lending rate of 10.54 percent is an appropriate rate to apply because it is a rate calculated in a CVD PRC final for a similar program based on the treatment of the benefit.  In the absence of information from the responding party, the rate calculated in another proceeding provides the most reliable and relevant information about the government's practices regarding these kinds of programs.  Many factors go into the calculation of a rate in any proceeding.  For lending programs these may include, among other things, the size of the loan, the interest rate on the loan, the term of the loan, the benchmark interest rate selected, and the size of the company's sales.  When selecting an AFA rate, [Commerce] is, by definition, operating with a lack of verifiable and reliable evidence about the impact of such factors in the case at hand.  In the absence of reliable information to control for a comparison of such factors between another case and the case at hand, [Commerce] corroborated the rate selected to the extent practicable, *i.e.*, by relying on a rate calculated for a similar program in a prior proceeding pertaining to the PRC.

*Id.* at 76–77.

## B.  Discussion

RZBC contends that Commerce's corroboration of the 10.54% AFA rate lacks the support of substantial evidence.  RZBC provides four primary reasons that Commerce was wrong to use the 10.54% rate from *Coated Paper from the PRC*.  The court rejects all four reasons and finds that Commerce's AFA rate is consistent with the law and has the support of substantial evidence.

First, RZBC argues that "the 10.54 percent rate does not reflect a 2012 interest rate or RZBC's sales value for the period" and, therefore, Commerce erred in selecting the 10.54% rate.

---

[5] To support this decision, Commerce cited its practice in *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China*, 77 Fed. Reg. 63,788 (Dep't Commerce Oct. 17, 2012) (final determ.) and accompanying I&D memo ("*Solar Cells from the PRC*").  I&D Mem 75.

RZBC Br. 32.  RZBC explains that "the SAA warns against the use of secondary information

that is outdated."  *Id.*; *see* SAA 870 ("Secondary information may not be entirely reliable

because, for example, as in the case of the petition, it is based on unverified allegations, or as in

the case of information from prior section 751(a) reviews, it concerns a different time frame than

the one at issue.").  RZBC explains that Commerce calculated the 10.54% rate in *Coated Paper

from the PRC* "using information from 2008, a full four years prior to the" period of review in

this case.  RZBC Br. 33.  RZBC insists that "the use of an older rate inflates the benefit that

would have applied to RZBC had it benefited from this loan in 2012."  *Id.*

> In response, Commerce explained that:

> In *Coated Paper from the PRC*, the policy lending program covered loans from banks in
> the PRC (whether policy banks or state-owned commercial banks).  Likewise, the Export
> Buyer's Credit program involves loans from a PRC bank.  A government lending
> program in one proceeding is a reasonable proxy for a government lending program in
> another proceeding.

 I&D Mem. 75.  Commerce also stated that, "[a]lthough the rate from *Coated Paper from the

PRC* is a few years old, [Commerce has] used that rate as an adverse rate in other proceedings,

and therefore the GOC has been on notice regarding it."  *Id.* at 76.  What is more, Commerce

explains that, because the GOC "has been on notice" regarding the 10.54% AFA rate but

nevertheless persevered in being uncooperative, it is reasonable to infer that the GOC "knows

that the actual usage of this program would lead to a rate at least as high as 10.54 percent."  *Id.*

Thus, in choosing the rate of 10.54%, Commerce argues that it is advancing the purpose of

AFA—"to ensure that a party does not achieve a better result by not cooperating than if it had

cooperated fully."  *Id.* (citing SAA 870).  The court concludes that Commerce's response to

RZBC's challenge amounts to a reasonable explanation of its determination.

Second, RZBC argues that the 10.54% rate from *Coated Paper from the PRC* "was an

uncreditworthy rate," and "inclusion of [this] uncreditworthy rate is not supported by substantial

evidence." RZBC Br. 34.  The rate for an uncreditworthy company is higher than the rate for a

creditworthy company.  RZBC Br. 34.  The record is devoid of any finding concerning the

creditworthiness of either RZBC or the buyers using the Buyer's Credit program.  Nonetheless,

Commerce defended its use of an uncreditworthy rate:

> [Commerce] does not have the necessary information about the operation of the Buyer's
> Credit program to calculate a subsidy rate.  This program differs from other subsidy
> programs typically examined by [Commerce] in that the government provides funds to
> the buyers of respondents' merchandise with the goal of increasing respondents' sales.
> At verification, the GOC refused to provide information concerning buyers that
> participated in this program during the POR.  Therefore, because we lack information
> regarding the specifics of the companies that benefit, it would be inappropriate to make
> speculative adjustments to the AFA hierarchy on the basis of alleged company-specific
> factors.  In other words, even if such an adjustment for creditworthiness makes sense, the
> agency lacks the necessary information on the record regarding the companies that
> received this credit including, for example, the GOC's analysis of these companies'
> creditworthiness, to make any adjustment to the rate.  Even though the RZBC
> Companies, as the producer, directly benefitted through the production and the
> distribution of their products, that benefit was based on the creditworthiness of the
> buyers.

I&D Mem. 76.  Though the above explanation appears reasonable, RZBC insists that it proves

that Commerce violated 19 U.S.C. § 1677m(d), which requires Commerce to "inform the person

submitting the response of the nature of the deficiency and . . ., to the extent practicable, provide

that person with an opportunity to remedy or explain the deficiency."  RZBC Br. 35.  Commerce

never informed RZBC of any deficiency.[6]  On that basis, RZBC asserts that the 10.54% AFA

rate "cannot be corroborated" and lacks the support of substantial evidence.  *Id.*

---

[6] Commerce did, however, ask the GOC about the details of the program.  GOC NSA Resp. 16.  Commerce
asked the GOC to "Provide a sample application for each type of financing provided under Export Buyer Credit's
along with the application's approval and the agreement between the respondent's customer and the [EXIM] Bank,
which establish the terms of the financing provided."  *Id.*  Commerce also asked the GOC to:

> Report the interest rate(s) established during the POR for the Export Buyer's Credits for all types of
> financing provided, for all loan terms (*e.g.*, loans ranging from 0 to 180 days and 180 to 270 days, etc.), and
> all denominations (*i.e.*, RMB and foreign currency).  Please provide documentation to support your answer.

But RZBC is wrong.  As the Government explains, "prior to the [GOC's] refusal to allow

verification, and Commerce's inability to verify non-use, Commerce had no reason to request

RZBC buyers' information."  Def. Resp. in Opp'n to Pls. Mot. for J. on Agency R. 24 n.7, ECF

No. 34 ("Gov't Br.").  In short, there was no known deficiency about which Commerce had to

inform the parties.  And Commerce provides a reasonable explanation for its decision to rely on

an uncreditworthy rate: given the GOC's failure to cooperate, Commerce had no information

with which to analyze the credit of buyers.

Third, RZBC claims that "programs more similar to EXIM Buyer's Credit are on the

record of this review."  RZBC Br. 36.  In particular, RZBC cites the 0.64% rate that Commerce

calculated for RZBC's use of the EXIM Export Seller's Credit program.  *Id.*  RZBC explains that

the EXIM Bank of China administers both the Export Seller's Credit program and the Export

Buyer's Credit program, and states that the two programs are "nearly the same."  *Id.*  Both exist

"to assist companies in exporting their products."  *Id.* at 37.  And the EXIM Bank of China

issued loans to RZBC during the period of review.  *Id.* at 36–37.  As a result, RZBC concludes

that the 0.64% rate from the Export Seller's Credit program "is clearly more representative [of]

RZBC's commercial reality during the POR than a rate from [a] different year with different

sales values."  *Id.* at 36.  RZBC concedes that "Commerce has developed a practice for selecting

AFA rates first by looking at identical programs within a case and second by looking at similar

programs in previous cases."  *Id.* at 37.  Following this practice yields the selected 10.54% AFA

rate from *Coated Paper from the PRC.*  Yet RZBC insists that "[a] comparison of [the seller's

---

*Id.*  In addition, Commerce asked the GOC to "Please explain and provide example[s] of the types [of]
documentation and paperwork that participating companies in the PRC must supply to the GOC when their buyers
receive [EXIM Bank] financing under this program."  *Id.*

    As stated above, the GOC refused to allow Commerce to verify adequately any of the answers provided in
response to these questions.  GOC Verification Report 3, PD 207 (Oct. 8, 2014).

credit and buyer's credit programs] demonstrates that the application of the 10.54 percent rate is

clearly not probative." *Id.* at 36.  Consequently, RZBZ maintains that Commerce erred by

failing to corroborate the 10.54% AFA rate.  *Id.* at 37.[7]

Commerce responded that the Seller's Credit program "is not an identical program."

I&D Mem. 75.  Commerce reasoned that, "[b]ecause [Commerce] has not calculated a rate for

the Export Buyer's Credits program in this review, and has not calculated a rate for the program

in another CVD PRC proceeding, [Commerce's] practice is to identify the highest rate calculated

for a similar program in another CVD proceeding."  *Id.*  Commerce then cites *Solar Cells from*

*the PRC* as the basis for its determination that "a lending program is similar to the program at

issue because the credits function as short-term or medium-term loans."  *Id.*  Commerce,

"therefore, determine[d] that the highest calculated rate for a comparable lending program is

10.54 percent calculated for preferential policy lending in *Coated Paper from the PRC*."  *Id.*

The court rejects RZBC's argument.  In essence, RZBC argues that, though Commerce

complied with its established practice, Commerce should have selected the 0.64% rate because it

more accurately reflects RZBC's commercial reality.  But there is a problem with this logic—

---

[7] RZBC also raises a new argument:  "As admitted by Commerce, the size, benchmark rate, total sales value and term of the loan are relevant to any subsidy determination.  Commerce in the final results, however, ignores the fact that all four elements are on the record."  RZBC Br. 37.  RZBC then concludes that Commerce could have used record evidence to determine the AFA rate by selecting values for the four foregoing elements.  For example, RZBC explains that Commerce could have used RZBC's verified export sales total as "the highest loan amount possible during the POR."  *Id.*  And it "could have selected the highest interest among the U.S. dollar denominated interest rates as AFA."  *Id.* at 38.  RZBC then insists that it is contrary to the corroboration statute to follow Commerce's established practice rather than use record evidence of the above four elements to calculate an AFA rate.  *Id.* 37–38.

In response, the Government insists that RZBC's argument is speculative and "provides no insight as to why" the record evidence that RZBC cites is "somehow relevant to a *buyer's* loan program or undermine[s] the rate selected by Commerce."  Gov't Br. 25–26.  According to the Government, "one of the reasons that Commerce determined to rely on facts available for this program was that it lacked information about loan recipients, the associated risk, and the resulting terms on which such loans were granted."  *Id.* at 26.  Therefore, the Government concludes that "there is no evidence to support RZBC's contention that the selected rate must bear some relationship to" the cited record evidence on the four elements above.  *Id.*  The Government is correct, and thus RZBC's new argument is unsuccessful.

there is no record evidence on the Buyer's Credit program with which to compare the 0.64% rate

to conclude, as RZBC does, that 0.64% is preferable.  And RZBC demonstrates neither (1) why

the 0.64% rate is "clearly more representative [of] RZBC's commercial reality" nor (2) why the

Seller's Credit program is more similar to the Buyer's Credit program than the program in

*Coated Paper from the PRC*.  The SAA recognized this problem when it explained that, "where

Commerce uses the facts available to fill gaps in the record, proving that the facts selected are

the best alternative facts would require that the facts available be compared with the missing

information, which obviously cannot be done."  SAA 869–70.  What is more, it is not inevitably

problematic even if, as RZBC argues, the 10.54% AFA rate fails to accurately reflect RZBC's

commercial reality.  After all, the "AFA rate should 'be a reasonably accurate estimate of the

respondent's actual rate, *albeit with some built-in increase intended as a deterrent to*

*noncompliance*."  *Essar Steel*, 753 F.3d at 1373 (emphasis added) (citation omitted).

Accordingly, RZBC's argument fails to show that Commerce erred in using its established

methodology to arrive at the 10.54% AFA rate.

        Fourth, RZBC argues that the 10.54% AFA rate "used by Commerce does not represent

the commercial reality of RZBC loan programs and as such is punitive."  RZBC Br. 39.  RZBC

explains that courts "have held that the purpose of the AFA rate . . . 'is to provide respondents

with an incentive to cooperate, not to impose punitive, aberrational, or uncorroborated margins.'"

RZBC Br. 39 (quoting *Essar Steel Ltd. v. United States*, 37 CIT __, __, 908 F. Supp. 2d 1306,

1310 (2013)).  RZBC argues that, "[i]n light of the above facts covering corroboration and the

fact that it was not RZBC which failed to cooperate but allegedly the GOC, the 10.54 percent

rate is excessively punitive."  RZBC Br. 39.  And so RZBZ asks the court to remand this issue.

This argument is unconvincing. Commerce has authority to apply AFA when, as here, a government is uncooperative but a respondent is cooperative. *Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365, 1372 (Fed. Cir. 2014) (explaining that "a collateral impact on a cooperating party does not render the application of adverse inferences in a CVD investigation improper"). More important, RZBC fails to demonstrate that the selected rate is punitive. As proof that the 10.54% AFA rate is "excessively punitive," RZBC cites the rates for its policy loans and the Seller's Credit loan. RZBC Br. 40–41. RZBC is correct that the 10.54% AFA rate exceeds the cited rates of other loans. But RZBC never explains why the rate for the Buyer's Credit program is necessarily comparable to the rates of the other cited loans. By extension, a significant disparity between these rates does not indicate that the chosen rate of 10.54% is even slightly inaccurate, much less "excessively punitive."[8]

In the end, none of RZBC's arguments demonstrate that Commerce's determination lacked the support of substantial evidence or was not in accordance with the law. And Commerce found that, without information from the GOC concerning the Buyer's Credit

---

[8] RZBC also argues that Commerce has "announced a change to its methodology and practice of selecting the highest rate from a similar program in another CVD proceeding involving the country under investigation, when there is no rate calculated for an identical program available." RZBC Br. 38. RZBC cites *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China*, 80 Fed. Reg. 41,003 (Dep't Commerce July 14, 2015) (final admin. review) ("*Solar Cells II*") and accompanying I&D Mem. at cmt. 1. RZBC asserts that, "[r]ather than use the rate from a similar program from a different CVD proceeding involving the country, Commerce explained that it was more appropriate to use 'the highest calculated rate from a similar program in the proceeding at issue, unless the rate is *de minimis*.'" RZBC Br. 38 (citation omitted). The 0.64% rate from the Seller's Credit program is the "highest rate calculated in the proceeding at issue." *Id.* at 38–39. Consequently, RZBC contends that this allegedly new practice required Commerce to use as AFA the 0.64% rate. *Id.* at 39.

This argument fails for two reasons. First, it is unclear whether Commerce's conclusions in *Solar Cells II* constitute an established agency practice. Second, *Solar Cells II* did not exist during the proceeding now on appeal before this court. Thus, Commerce had no reason to, nor will this court now order it to, apply the practice from *Solar Cells II*. *See, e.g.*, *QVD Food Co. v. United States*, 658 F.3d 1318, 1324–25 (Fed. Cir. 2011) ("Judicial review of antidumping duty administrative proceedings is normally limited to the record before the agency in the particular review proceeding at issue and does not extend to subsequent proceedings."); *Co-Steel Raritan, Inc. v. ITC*, 357 F.3d 1294, 1316 (Fed. Cir. 2004) ("[I]f litigants could demand rehearing as a matter of law because of new circumstances, new trends or new facts, 'there would be little hope that the administrative process could ever be consummated in an order that would not be subject to reopening.'" (citation omitted)).

program, the 10.54% rate from another proceeding "provides the most reliable and relevant

information about the government's practices regarding" this program.  I&D Mem. 76.  Given

the limited record evidence available, Commerce corroborated the 10.54% rate to "the extent

practicable." 19 U.S.C. § 1677e(c)(1).  The court sustains Commerce's decision.

## **<u>CONCLUSION</u>**

For the above reasons, the court sustains the *Final Results* and the Remand Results and

will enter judgment accordingly.

/s/ Richard W. Goldberg
Richard W. Goldberg
Senior Judge

Dated:  April 10, 2017
New York, New York